# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR N. GAMEZ,<br><br>              Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>              Defendant. | ) 1:08-cv-01642-SMS<br>)<br>) DECISION AND ORDER DENYING<br>) PLAINTIFF'S SOCIAL SECURITY<br>) COMPLAINT (DOC. 1)<br>)<br>) ORDER DIRECTING THE ENTRY OF<br>) JUDGMENT FOR DEFENDANT MICHAEL J.<br>) ASTRUE, COMMISSIONER OF SOCIAL<br>) SECURITY, AND AGAINST PLAINTIFF<br>) HECTOR N. GAMEZ<br>) |

Plaintiff is proceeding in forma pauperis and with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application of March 30, 2004, made pursuant to Title II of the Social Security Act, for disability insurance benefits (DIB), in which he alleged that he had been disabled since June 9, 2003, due to low back injury. (A.R. 140-43.) The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1), and pursuant to the order of Judge Lawrence J. O'Neill filed November 18, 2008, the matter has been assigned to the Magistrate Judge to conduct all further proceedings in this case, including entry of final

judgment.

The decision under review is that of Social Security Administration (SSA) Administrative Law Judge (ALJ) Christopher Larsen, dated July 25, 2008 (A.R. 14-21), rendered after a hearing held on June 24, 2008, at which Plaintiff appeared by video and testified with the assistance of a non-attorney representative. (A.R. 14, 61-91).[1]

The Appeals Council denied Plaintiff's request for review of ALJ Larsen's decision on September 11, 2008 (A.R. 6-8), and thereafter Plaintiff filed his complaint in this Court on October 27, 2008. Briefing commenced on June 25, 2009, and was completed with the filing of Defendant's responsive brief on July 21, 2009. The matter has been submitted without oral argument to the Magistrate Judge.

I. Jurisdiction

The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g), which provides that individuals may obtain judicial review of a final decision of the Commissioner of Social Security by initiating a civil action in the district court within sixty days of the mailing of the notice of decision. Plaintiff timely filed his complaint on October 27, 2008, less than sixty days after the mailing of the notice of decision on or about September 11, 2008.

---

[1] A previous hearing on Plaintiff's application was conducted by another ALJ on April 26, 2006, and a decision finding Plaintiff not disabled issued on September 14, 2006. (A.R. 23-60, 96-102.) The Appeals Council granted Plaintiff's request for review, vacated the decision of September 2006, and remanded the matter for further administrative proceedings, including a new hearing, an opportunity to submit additional evidence, completion of the administrative record, and a new decision because the administrative record could not be located or reconstructed. (A.R. 103-05.)

II. <u>Standard and Scope of Review</u>

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971), but less than a preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006); <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's

3

determination that the claimant is not disabled if the
Commissioner applied the proper legal standards, and if the
Commissioner's findings are supported by substantial evidence.
See, Sanchez v. Secretary of Health and Human Services, 812 F.2d
509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If
the Court concludes that the ALJ did not use the proper legal
standard, the matter will be remanded to permit application of
the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th
Cir. 1987).

    III. Disability

        A. Legal Standards

    In order to qualify for benefits, a claimant must establish
that she is unable to engage in substantial gainful activity due
to a medically determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).
A claimant must demonstrate a physical or mental impairment of
such severity that the claimant is not only unable to do the
claimant's previous work, but cannot, considering age, education,
and work experience, engage in any other kind of substantial
gainful work which exists in the national economy. 42 U.S.C.
1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th
Cir. 1989). The burden of establishing a disability is initially
on the claimant, who must prove that the claimant is unable to
return to his or her former type of work; the burden then shifts
to the Commissioner to identify other jobs that the claimant is
capable of performing considering the claimant's residual
functional capacity, as well as her age, education and last

4

fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520;[2] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

    B. The ALJ's Findings

The ALJ found that Plaintiff had severe impairments of lumbar spine osteoarthritis, lumbar spine degenerative disk disease, hypertension, and obesity, but Plaintiff had no impairment or combination of impairments that met or medically

---

[2] All references are to the 2008 version of the Code of Federal Regulations unless otherwise noted.

equaled a listed impairment. (A.R. 16-17.) Plaintiff retained the residual functional capacity (RFC) to lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk or sit a total of about six hours of an eight-hour workday; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (A.R. 17.) Plaintiff could not perform his past relevant work, but because he was a younger individual (forty-five years old on the date of alleged disability onset, and fifty as of October 2007) with at least a high school education, the ability to communicate in English, and the aforementioned RFC, there were jobs that existed in significant numbers in the national economy because Plaintiff's non-exertional limitations did not significantly reduce the range of light jobs that Plaintiff could otherwise perform. (A.R. 19-20.) Accordingly, Plaintiff was not disabled at any time from June 9, 2003, through the date of decision. (A.R. 20-21.)

C. Plaintiff's Contentions

Plaintiff argues that the ALJ failed to credit, or to state legally sufficient reasons for rejecting, the opinion of the examining, psychological expert, Dr. Lessenger, who diagnosed borderline intellectual functioning, and the ALJ thereby erroneously found at step two of the sequential analysis that Plaintiff's mental impairment or impairments were not severe, and at step five that Plaintiff could perform the work activity identified by the ALJ. Plaintiff further contends that at step three, in connection with determining Plaintiff's physical RFC, the ALJ failed to state clear and convincing reasons for

rejecting the more recent opinion of Dr. Wolney, a treating physician, and for adopting the outdated opinion of a non-examining physician; further, the ALJ's finding concerning Plaintiff's RFC was not supported by substantial evidence. Accordingly, Plaintiff seeks remand for an award of benefits or, in the alternative, remand for correction of legal errors.

IV. <u>Medical Evidence</u>

On June 9, 2003, Plaintiff suffered an injury while lifting or pushing a very heavy object while working as a maintenance electrician. (A.R. 352.) Findings of Dr. Kian Moini, treating physician, on June 12, 2003, were mild; the diagnosis was lumbosacral spine strain. (A.R. 348-49.) On June 16, 2003, Plaintiff was cleared to return to modified work with no lifting, pulling, or pushing over ten pounds, and no repetitive bending, stooping, or twisting. (A.R. 344-46.) Plaintiff exhibited tenderness in the lumbosacral area with muscle spasms, with some pain and limitations during testing of range of motion. (A.R. 344-45.) Plaintiff experienced only slight improvement. On June 24, 2003, his treating physician examined Plaintiff and noted generally mild findings; the diagnosis was lumbosacral spine strain with subjective complaints far outweighing objective findings; accordingly, a MRI scan was recommended. (A.R. 341-42.)

In June 2003, a MRI scan of the lumbar spine revealed that Plaintiff had congenitally narrow AP diameter of the lumbar spinal canal; a ventral and left-sided disc protrusion at L3-4 and facet hypertrophy resulting in moderate, left-sided foraminal stenosis and mild to moderate central canal stenosis; mild canal stenosis and bilateral foraminal stenosis at L4-5 and L2-3; and

mild canal stenosis at L1-2. (A.R. 354-55.)

In July 2003, consulting examiner Brian S. Grossman, M.D., examined Plaintiff and evaluated him orthopedically at the request of Dr. Cho after reviewing Plaintiff's medical history. (A.R. 272-78.) Plaintiff complained of low back pain, popping in various areas of his spine, tingling and numbness in the buttocks area, low back pain when coughing or sneezing, and very limited range of motion in the low back. Plaintiff stood without evidence of list and with normal lumbar lordosis and thoracic kyphosis; gait was normal without apparent limp or weakness, with ability to toe-walk and heel-walk without difficulty. Plaintiff could flex forward to reach the thighs with the fingertips with lack of reversal of lumbar lordosis; lumbar extension was five per cent of normal, and right and left lateral flexion were ten per cent of normal, all with increased pain in the back. Plaintiff had 5/5 motor function of the hips and extremities bilaterally, intact light touch throughout sensory exam, negative straight-leg raising both seated and supine bilaterally, full hip range of motion bilaterally, negative Faber and Patrick's test bilaterally, and tenderness in the lumbosacral midline without muscle spasm. Imaging studies of the lumbar spine showed all vertebrae present with normal lumber lordosis, coronal alignment within normal limits, and well-maintained vertebral body heights and disc heights at all levels. There was no evidence of spondylolisthesis or spondylolysis. The MRI of the lumber spine taken June 26, 2003, reflected facet joint enlargement at L2-3, L3-4, and L4-5, with minimal disc bulges and mild central and bilateral foraminal stenosis at those levels; L1-2 and L5-S1 were

8

normal. Dr. Grossman wrote:

> Functional capacity evaluation performed at Pair and
> Marotta on 7/2/2003 reveals an 18% whole body impairment
> with valid results. Reliability profile indicates a few
> non-organic signs present as well as very poor effort or
> voluntary submaximal effort which is not necessarily related
> to pain, impairment or disability.

(A.R. 275.) Dr. Grossman's diagnosis was lumbar strain and mild
facet enlargement with small disc bulges at L2-3, L3-4 and L4-5
with mild central and foraminal stenosis. (Id.) He concluded that
the lumbar MRI findings were mild and that the prognosis for
resolution of symptoms with additional conservative care
(physical therapy and oral anti-inflammatory medication) was
good. Plaintiff could work and lift no more than approximately
twenty-five pounds with no more than occasional bending and
stooping. (A.R. 275.)[3]

In August 2003, in connection with a worker's compensation
claim, Plaintiff's primary treating physician, Dr. Russell W.
Nelson, M.D., an orthopedic surgeon, performed an orthopedic
evaluation of Plaintiff, who was working four hours a day at the
time. Plaintiff complained of constant pain in his middle and low
back with occasional radiating weakness and numbness from the low
back down into both legs, and with pain increasing with bending
or being in one position for a long period of time. (A.R. 312-
17.)  Plaintiff had local lumbar paraspinous tenderness and
muscle tightness, no extension, flexion to fifty degrees, and
lateral bending to ten degrees, with minimal rotations;
hamstrings were severely tight bilaterally; there was no
significant localizing sciatica, and foot dorsiflexion was trace

_____

[3] Plaintiff failed to appear for a follow-up appointment. (A.R. 271.)

positive right, with intact hip, knee, and ankle motion and intact reflexes in the knees and ankles; and motor and sensory exam were intact with Babinski's downgoing bilaterally. Plain films revealed good disc height with no signs of significant spurring and with short pedicles in the mid-lumbar region. Dr. Nelson's diagnosis was lumbar disc bulge with stenosis, L3-4; lesser, L4-5. He opined that the work injury combined with the pre-existing short pedicles produced a significant stenotic lesion at L3-4, lesser above and below. Plaintiff had difficulty moving and becoming fully erect. Dr. Nelson opined that he was temporarily totally disabled and should start epidural injections and possibly a therapy program. (A.R. 316.)

In September and October 2003, Plaintiff received injections of Depo-Medrol and Bupivacaine for complaints of painful radiculitis, and he underwent myelogram contrast dye epidurography. (A.R. 356-61, 424-85.) In November 2003, treating orthopedist Dr. Nelson noted that the injections produced only slight improvement. (A.R. 309.) Dr. Nelson reviewed MRI films that showed slight disc desiccation and posterior disc protrusion producing moderate canal stenosis at L3-4; the remaining discs had excellent hydration with no significant bulges or herniations. The diagnosis was lumbar disc bulge with stenosis, L3-4; lesser, L4-5. Dr. Nelson recommended pool therapy and medication. Plaintiff remained temporarily totally disabled. (A.R. 310.) At the end of December 2003, findings upon examination were essentially the same (A.R. 307), but Plaintiff reported some improvement with physical therapy. Plaintiff remained temporarily totally disabled, and the recommendation was

continued medication and therapy. (A.R. 307.) Plaintiff underwent physical therapy from November 2003 through March 2004 that permitted him to move with greater ease, but he continued to have deficits in strength and functional mobility of the low back. (A.R. 218-34, 219.)

In February 2004, Plaintiff continued with medication, and Dr. Nelson considered him temporarily totally disabled. (A.R. 303-05.) Dr. Nelson submitted a supplemental report reviewing medical records, in which he referred to Dr. Larry M. Cho's pre-MRI note of June 24, 2003, that Plaintiff's subjective complaints far outweighed his objective findings, and Dr. Brian S. Grossman's recommendation in July 2003 that Plaintiff could return to work with restrictions limiting him to lifting no more than approximately twenty-five pounds and only occasional bending and stooping, with physical therapy and anti-inflammatory medication. (A.R. 300.)

On March 16, 2004, Dr. Nelson reported that Plaintiff was permanent and stationary. (A.R. 295-98.) Plaintiff still had localized back pain and was working on exercise strengthening; on examination Dr. Nelson found tenderness in the lumbar and paraspinous regions, flexion of sixty degrees, extension of fifteen degrees with pain, lateral bending of twenty degrees, and rotations of twenty-five degrees. Lower extremity reflexes and motor and sensory exams were intact. Straight leg raise was negative. The diagnosis remained lumbar disc bulges with stenosis, greatest at L3-4, lesser at L4-5. Subjective factors of disability included intermittent, slight low back pain that was moderate with prolonged standing and walking, twisting, turning,

11

bending, or heavy lifting. Objective factors of disability were disc injury with stenosis at L3-4 and disc injury with lesser stenosis at L4-5. Dr. Nelson opined that based on the objective and subjective factors, and further operating on a prophylactic basis, heavy work and prolonged standing and walking were precluded; occupational rehabilitation was warranted. Future medical care included therapy and medication for severe flare-ups of his condition; surgical decompression in the future was a possibility. (A.R. 297.)

In June 2004, consulting examining physician Juliane Tran, M.D., who was certified in physical medicine and rehabilitation, reviewed Dr. Nelson's records and performed a consulting, comprehensive, orthopedic evaluation. (A.R. 235-38.) Dr. Tran noted normal gait, walking, Romberg test, and tandem gait; lumbar flexion limited by back pain, and pain with extension of twenty-five degrees; tenderness to palpation over the right L5-S1 level and right and left sciatic notches; negative straight leg raising bilaterally; and normal proprioception, sensory exam, motor strength, bulk, and tone bilaterally. The impression was back pain, probably from lumbar disk disease or discogenic back pain, with significantly decreased flexion, symmetrical reflexes and strength, and tenderness. He was limited to lifting no more than twenty-five pounds occasionally and ten pounds frequently with no sitting or standing more than six hours. (A.R. 237-38.)

On July 13, 2004, a non-examining state agency physician opined that as a result of scoliosis and back pain, Plaintiff could lift and carry twenty pounds occasionally, ten pounds frequently, and sit and stand and/or walk for about six hours in

an eight-hour day, with only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds. (A.R. 240-51.)

On September 1, 2004, Dr. Stuart R. Hutchinson, M.D., an orthopedist and agreed medical examiner in Plaintiff's workers' compensation proceeding, reviewed Plaintiff's medical records for forty-five minutes and examined Plaintiff, who complained of pain in the lower back region stretching up towards his right lower rib margin, occasional numbness of the right foot, and increased pain with walking and sitting or driving for long periods. (A.R. 253-59.) Dr. Hutchinson found Plaintiff to be in relatively good shape, with normal gait pattern, ability to walk on heels and toes, equal leg lengths, no atrophy in the lower extremities, straight leg raising with some back pain bilaterally from sitting at about sixty degrees, good range of motion of the hips, lumbar forward flexion of the fingertips to within eight inches of the floor, extension of fifteen degrees, and normal sensory, motor, and reflex examination of the lower extremities. Dr. Hutchinson opined that Plaintiff's intermittent slight to moderate pain, which was made worse with prolonged standing or sitting, his mild decreased ranged of motion of the lumbar spine, and the findings of stenosis at L2-3, L3-4, and L4-5 levels resulted in a preclusion from heavy work. (A.R. 256.) Future medical treatment should include periodic, short courses of aqua therapy; surgery was a possibility if symptoms were to become unmanageable. (A.R. 257.)

Throughout 2004 and 2005, Plaintiff saw Dr. Nelson on an as-needed basis, with complaints in October 2004 of increasing

13

symptoms into his lower right leg and tingling into the right
foot in addition to low back pain and discomfort (A.R. 292);
reports in December 2004 of abdominal pain possibly from
medications taken for his industrial injury (A.R. 289-90);
complaints in June 2005 of persistent back pain radiating into
the left side, with numbness, tingling, and burning (A.R. 286);
and a report of trouble finding work and persistent and
symptomatic back pain with significant help from aqua therapy in
September through November 2005 (A.R. 280-85).

On October 5, 2004, Anne M. Khong, M.D., a state agency
medical consultant, evaluated Plaintiff's lumbar stenosis and
opined that Plaintiff could lift fifty pounds occasionally,
twenty-five pounds frequently, and sit and stand and/or walk
about six hours in an eight-hour workday, with no climbing of
ladders, ropes, or scaffolds, only occasional climbing of ramps
and stairs, stooping, kneeling, crouching, and crawling, and
frequent balancing. (A.R. 260-70.)

Records from Clinica Sierra Vista of Plaintiff's treatment
by Dr. Wolney reflect treatment from April 2006 through March
2008 for neck and back pain and depression. (A.R. 402-417.) When
Plaintiff complained of neck pain, headaches, numbness in the
fingers, and coldness in the left leg in April 2006, he was
treated with Hydrocodone, Tylenol, Ibuprofen, Chlorzoxazone, and
Ranitidine, with no objective or clinical signs noted in April
2006. (A.R. 414.) Clinical signs of poor range of motion, pain,
and stiffness in the neck and back were noted in June 2006, with
an assessment of paravertebral muscle spasm of the "C" spine.
(A.R. 412-13.) On July 28, 2006, at a follow-up regarding MRI

results, Plaintiff's neck and back were within normal limits;
however, the doctor noted that because of pain from discogenic
disease at L3-4, Plaintiff was not able to work, and he suggested
a surgical consultation. (A.R. 411.) In August 2006, Plaintiff
had pain on motion of the "C" spine and was referred to an
orthopedist. (A.R. 410.)

On June 1, 2006, consulting, examining physician Leslie H.
Lessenger, Ph.D., performed a psychological evaluation of
Plaintiff after reviewing records. (A.R. 318-31.) Aside from the
mental status exam and psychological testing, all information was
gathered through interview with the client; no effort was made to
confirm information from outside sources. (A.R. 318-31.)
Plaintiff's chief complaint was constant neck and shoulder pain,
stiffness in the morning, and inability to sit in a soft chair
longer than thirty to forty-five minutes. He could perform light
housekeeping and drive. Plaintiff was oriented, had adequate
hygiene, moved awkwardly as if in pain, and adjusted himself
frequently, standing up at times. His mood was slightly
irritable, and he reported being generally short-tempered and
unhappy because of his physical condition. He was cooperative,
put forth good effort on all tasks, had logical and organized
speech, exhibited no signs of thought disorder, and denied
hallucinations. He had suicidal thoughts without intent; appetite
was variable, and he had gained thirty pounds in the past three
years. He saw shadows, had frequent nightmares, thoughts circled
about his head, and he was anxious because of his inability to
work as he used to due to slowness and an absence of patience
with tasks. Plaintiff scored a full scale IQ of 76 on the

Wechsler Adult Intelligence Scale-III (WAIS-III), with a verbal IQ score of 79 and a performance IQ score of 77. He performed in the borderline range on tasks requiring nonverbal, fluid reasoning and visual-motor integration; his perceptual organization score was 78; and he performed in the low average range on tasks which reflected verbal acquired knowledge and verbal reasoning, with a verbal comprehension score of 84. On the Wechsler Memory Scale-III, Plaintiff scored in the borderline to average range on all primary sub-tests with the exception of auditory delayed, which was extremely low. Scores on the Wide Range Achievement Test-3 were post-high school in reading, high school in spelling, and seventh grade in math. Administration of the Test of Memory Malingering was not indicative of malingering. Dr. Lessenger's diagnostic impression was anxiety disorder (mixed anxiety/depressive disorder) and pain disorder associated with both psychological factors and a general medical condition, with a global assessment of functioning of 60. (A.R. 321.) Dr. Lessenger assessed no restrictions on daily activities, no difficulties in social functioning, mild impairment of concentration, average persistence, and no limitations in the ability to understand, carry out, and remember simple instructions, to respond appropriately to coworkers and supervisors, or to respond to the public and to usual work situations and changes in routine work settings.

On June 26, 2006, a radiological study of the cervical spine revealed a congenitally narrow AP diameter of the lumber spinal canal, fat within the filium terminale, ventral and left-sided disc protrusion at L3-4 with facet hypertrophy resulting in

moderate, left-sided foraminal stenosis and mild to moderate central canal stenosis, mild canal stenosis and bilateral foraminal stenosis at L4-5 and L2-3, and mild canal stenosis at L1-2. (A.R. 354-55.) A study of the cervical spine taken on June 23, 2006, reflected a mild paravertebral muscle spasm. (A.R. 391.)

On June 3, 2006, consulting examining physician Juliane Tran, M.D., re-evaluated Plaintiff, who complained of neck and back pain exacerbated with movement or prolonged sitting, standing, walking, or bending over. (A.R. 332-39.) Plaintiff's medications were Ibuprofen, Hydrocodone, Zantac, Flexeril, Robaxin, Flurazepam, Tylenol ES, and Tylenol Arthritis. (A.R. 333.) The doctor observed moderate obesity, painful behaviors, a lack of maximum effort during the exam, and depressed mood; however, Plaintiff could tolerate sitting. A mental status examination revealed that Plaintiff was alert and oriented, with normal recall, intact judgment, and fair abstract thinking. Physically, Plaintiff could do toe, heel, and tandem walking, and his finger-to-nose, heel-to-shin, and rapid alternating movements were intact. Flexion was limited and accompanied by pain, although lateral flexion, lumbar lateral tilting, and simultaneous extension were not painful. There was tenderness to palpation over the cervical spine and the right and left L5-S1 lumbar levels. Testing for Trendelenburg, Faber's, Piriformis, Neer's, Tinel's, and Phalen's was negative bilaterally; straight leg raising was negative bilaterally without back pain or radicular symptoms, and Babinski was negative. Motor strength was 5/5 bilaterally, and sensation was normal.

Dr. Tran's impression was back pain, most likely from lumbar disk disease. There was no evidence of lumbar radiculopathy. Plaintiff had symmetrical reflexes and normal strength and sensory examinations in the lower extremities, decreased lumbar range of motion and pain on palpation, and somewhat guarded mobility. Dr. Tran opined that Plaintiff should be restricted in activities involving standing and walking more than six hours per day or lifting more than fifty pounds occasionally and over twenty-five pounds frequently, with no postural limitations or restrictions on sitting or working at heights. (A.R. 335.)

Treatment records of Dr. Wolney resumed in March 2007, with Plaintiff appearing for medication refills (Atenolol and Lisinopril). There was a notation that neck, extremities, hips, and back were within normal limits, with neck pain and spasm. The plan was medication. (A.R. 409.) Plaintiff appeared for medication refills in April 2007, complaining of neck and back pain. The doctor's note reflects that neck and back and all extremities were within normal limits. Medications were adjusted. (A.R. 408.) In June 2007, Plaintiff appeared for a follow-up as to his depression; he had poor range of motion and pain in the neck, although neck, back, extremities, and hips were all noted to be within normal limits. The doctor refilled Plaintiff's Zoloft prescription and Ibuprofen; Quinapril was "D/C." (A.R. 407.)

In July 2007, an x-ray of the lumbar spine reflected degenerative osteo-arthritic changes of the lumbar spine. (A.R. 400.) Various referrals resulted from Plaintiff's visit to the Kern Medical Center Clinic on July 23, 2007, where Plaintiff

complained of back pain, blurred vision, dizziness, headaches, sleep disturbance, and occasional feelings of heavy neck and arms and hand cramps; he had been under increased stress recently and had been crying at times. The doctor's impression was hypertension, depression with anxiety but without suicidal or homicidal ideations, and obesity. (A.R. 393-94.)

Plaintiff did not return to Dr. Wolney until September 2007, when he sought medication refills for depression, neck spasm, and back pain; examination revealed back spasm at the neck and low back pain at the back, with neck, back, and extremities all within normal limits. The doctor refilled Plaintiff's Zoloft and prescribed Ibuprofen. (A.R. 405.)

In February 2008, Plaintiff sought treatment for the site of a tooth extraction and a swollen elbow; no mention was made of Plaintiff's back, neck, or depressive symptoms. In referring to Plaintiff's history of depression and hypertension, the doctor noted "good control." Medications were Zoloft, Ibuprofen, Norvasc, and Tylenol. (A.R. 403.)

On March 21, 2008, Robert Wolney, M.D., on the basis of having seen Plaintiff two to three times per year since 2003, rendered an opinion on a questionnaire relating to lumbar spine and obesity residual functional capacity from 2003 to the present. (A.R. 418-23, 402.) Plaintiff's degenerative disc disease of the lumbar spine involved chronic back and neck pain with associated difficulty in bending that was demonstrated by tenderness, muscle spasm and weakness, sensory changes, reduced grip strength (dropping things), and "Mostly Upper Extremeties Tremers." (A.R. 418.) At a height of six feet and weight of 279

pounds, Plaintiff had a BMI of 37 and met the criteria for obesity II, which Dr. Wolney indicated did "implicate" slowed physical reaction time and ambulation, limitations on the distance of ambulation, reduction in capacity to handle physical and emotional stress, pain in the upper and lower extremities, and chronic fatigue. (A.R. 419.) Plaintiff could not ambulate effectively due to stiffness and pain that was demonstrated by positive straight leg raising bilaterally at thirty degrees, abnormal gait, and sensory loss in the feet. Treatment was not described, although drowsiness was listed apparently as a side-effect of medication. (A.R. 420.) Plaintiff's impairment lasted or could be expected to last at least twelve months. (A.R. 420.)

Dr. Wolney stated that Plaintiff's physical and emotional impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (A.R. 421.) However, a question mark was written over the "Yes" response line that followed the query, "Is your patient a malingerer?" (A.R. 420.) Dr. Wolney indicated that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. Psychological conditions affecting Plaintiff's physical condition included depression, somatoform disorder, and anxiety. Plaintiff's symptoms were such as to interfere constantly with the maintenance of attention and concentration needed to perform even simple work tasks; Plaintiff was frequently incapable of even low-stress jobs based on Plaintiff's past history. Plaintiff's significant depression and psychological overlay affected Plaintiff's ability to work at a regular job on a sustained basis. (A.R. 423.)

Dr. Wolney opined that Plaintiff could walk without rest or severe pain for 100 feet, sit and stand no more than ten minutes at one time, and sit, stand, and walk less than two hours total in an eight-hour working day. (A.R. 421-23.) Plaintiff required accommodations that included periods of walking around every ten minutes for one hundred minutes; shifting of positions at will from sitting, standing, or walking; taking unscheduled breaks every fifteen minutes for ten minutes, with random movement every ten to fifteen minutes; and using a cane or other unspecified assistive device. Plaintiff could rarely lift less than ten pounds, never look down with sustained flexion of the neck, rarely turn the head right or left or look up, and frequently hold his head in a static position. He could never climb ladders and could only rarely twist, stoop (bend), crouch, squat, or climb stairs. He had significant limitations with reaching, handling, or fingering such that he was limited to only ten percent of a workday with respect to using his hands to grasp, turn, or twist objects, his fingers to perform fine manipulation, and his arms to reach overhead. Dr. Wolney indicated somewhat inconsistently that Plaintiff's impairments were not likely to produce good days and bad days, but that Plaintiff was likely to be absent from work as a result of his impairments more than four days per month. (A.R. 423.) Dr. Wolney concluded that considering Plaintiff's depression and psychological overlay in combination with his degenerative disk disease and obesity, Plaintiff was unable to work eight hours a day five days a week. (A.R. 423.)

Because Plaintiff raises no issue concerning the legal standards or the sufficiency of the evidence relating to the

ALJ's findings concerning Plaintiff's subjective complaints, the testimonial and other lay evidence related to those findings is not summarized at length.

V. <u>Severity of Plaintiff's Mental Impairment</u>

The ALJ found that Plaintiff's anxiety and pain disorder were not severe. He stated in pertinent part:

> The psychological consultative examiner diagnosed Mr. Gamez with an anxiety disorder and a pain disorder. However, the consultative examiner determined Mr. Gamez had essentially no work-related limitations resulting from diagnosed impairments (citation omitted).
>
> Mr. Gamez's medically-determinable mental impairments of an anxiety disorder and a pain disorder do not cause more than minimal limitation in his ability to perform basic mental work activities, and are therefore non-severe. In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (citation omitted). These four broad functional areas are known as the "paragraph B" criteria.
>
> Mr. Gamez has no restriction of activities of daily living, no difficulties in maintaining social functioning and only mild difficulties in maintaining concentration, persistence, or pace. Mr. Gamez has not exhibited repeated episodes of decompensation, each of extended duration. Because Mr. Gamez's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, it is non-severe (20 CFR 404.1520a(d)(1)).

(A.R. 16-17.)

Plaintiff argues that because tests administered by the examining consultant, Dr. Lessenger, reflected that Plaintiff's IQ test scores (76 through 79) were in the borderline range of intellectual functioning, Plaintiff necessarily suffered significant non-exertional limitations and thus had a severe mental impairment. Plaintiff relies on a case with distinguishable facts, <u>Tagger v. Astrue</u>, 536 F.Supp.2d 1170, 179-

80 (C.D.Cal. 2008) (involving an applicant whose IQ scores were between 65 and 70 and thus was in the mentally retarded range, and who had documented illiteracy) and on cases from the Eighth Circuit concerning the sufficiency of various combinations of evidence to demonstrate that borderline intellectual functioning constitutes a severe mental impairment. (Brief pp. 9-10.)

At step two, the Secretary considers if claimant has "an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). This is referred to as the "severity" requirement and does not involve consideration of the claimant's age, education, or work experience. The step-two inquiry regarding severity is a de minimis screening device to dispose of groundless claims. <u>Bowen v. Yuckert</u>, 482 U.S. 153-54 (1987).

In order to be disabled, one must suffer from an impairment or combination thereof that is severe, which is defined as meaning that it significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities include the abilities and aptitudes necessary to do most jobs, such as physical functions of walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). If the evidence establishes only that one's impairment or combination thereof was

only a slight abnormality that had no more than a minimal effect on an individual's ability to work, it is not severe. See Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). An ALJ may find that a claimant lacks a medically severe impairment or combination thereof only when his conclusion is clearly established by medical evidence. Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005).

The evidence here did not support Plaintiff's assertion that any borderline intellectual functioning imposed more than a slight abnormality. Dr. Lessenger discerned no restrictions on daily activities and no difficulties in maintaining social functioning, in understanding, remembering, and carrying out simple instructions, or in responding appropriately to coworkers, supervisors, the public, usual work situations, and changes in work routines. Dr. Lessenger assessed only a mild impairment of concentration; persistence was average; and the GAF of 60 indicated moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., text revision) (DSM-IV-TR).

However, Defendant correctly points out that Plaintiff's argument also fails at a more fundamental level. It is the Plaintiff's burden to demonstrate that he suffers from a medically determinable impairment, but symptoms alone are insufficient to demonstrate an impairment, which must be demonstrated by medically acceptable, clinical, diagnostic

techniques. <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1006 (9th Cir. 2005). It has been held that a score from an objective test is insufficient to establish an impairment unless accompanied by a diagnosis or finding of the impairment. <u>Id.</u> (citing Soc. Sec. Ruling 96-6p).

Here, Dr. Lessenger did not diagnose or find borderline intellectual functioning. He diagnosed anxiety disorder and pain disorder at Axis I, but under Axis II, he chose to indicate "V71.09," which signifies no diagnosis.[4] (A.R. 321). Plaintiff has the burden to produce sufficient evidence that he or she actually suffers from an impairment, or else it need not be factored in to a disability analysis. <u>Macri v. Chater</u>, 93 F.3d 540, 544 (9th Cir. 1996). Although Plaintiff asserts generally that the ALJ failed adequately to consider the opinions of the physicians in connection with this argument, Plaintiff fails to identify what evidence he contends would have demonstrated that borderline intellectual functioning was an impairment or severe impairment of Plaintiff. (Brief p. 14.) Plaintiff has failed to establish that in concluding that Plaintiff did not have a severe impairment of borderline intellectual functioning, the ALJ applied incorrect legal standards or reached a conclusion that was unsupported by substantial evidence in the record.

The Court thus has found it unnecessary to address Plaintiff's contentions concerning the effect of a severe

---

[4] A notation of V71.09 on Axis I or II means that no disorder on that axis is present. <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed., text revision) at pp. 28-29 (DSM-IV-TR).

impairment of borderline intellectual functioning on the
vocational evidence. (Brief pp. 9-12.)

VI. Weighing of Dr. Wolney's Opinion

As to Plaintiff's RFC, the ALJ concluded that the opinion of
Dr. Wolney was unreliable and entitled to little evidentiary
weight. (A.R. 19.) The ALJ adopted the "most restrictive opinion
in the record, and the most favorable to Mr. Gamez," namely, that
of the consulting, non-examining state agency physician of July
13, 2004, to the effect that Plaintiff could lift and carry
twenty pounds occasionally and ten pounds frequently, and sit and
stand and/or walk for about six hours in an eight-hour day, with
only occasional climbing of ramps and stairs, balancing,
stooping, kneeling, crouching, and crawling, and never climbing
ladders, ropes, or scaffolds. (A.R. 19, 240-51.)

Plaintiff argues that the ALJ's weighing of Dr. Wolney's
opinion was not supported by substantial evidence or a statement
of legally sufficient reasons. Plaintiff contends that because
Dr. Wolney's opinion was more recent and was rendered by a
treating physician, the ALJ erred in adopting the opinion of a
non-examining state agency physician; further, contrary to the
ALJ's express conclusion, the various opinions represented the
different conditions of Plaintiff over time and thus were not
inconsistent.

The standards for evaluating treating source's opinions
are as follows:

> By rule, the Social Security Administration favors
> the opinion of a treating physician over
> non-treating physicians. See 20 C.F.R. § 404.1527.
> If a treating physician's opinion is
> "well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence
in [the] case record, [it will be given]
controlling weight." Id. § 404.1527(d)(2). If a
treating physician's opinion is not given
"controlling weight" because it is not
"well-supported" or because it is inconsistent
with other substantial evidence in the record, the
Administration considers specified factors in
determining the weight it will be given. Those
factors include the "[l]ength of the treatment
relationship and the frequency of examination" by
the treating physician; and the "nature and extent
of the treatment relationship" between the patient
and the treating physician. Id. §
404.1527(d)(2)(i)-(ii). Generally, the opinions of
examining physicians are afforded more weight than
those of non-examining physicians, and the
opinions of examining non-treating physicians are
afforded less weight than those of treating
physicians. Id. § 404.1527(d)(1)-(2). Additional
factors relevant to evaluating any medical
opinion, not limited to the opinion of the
treating physician, include the amount of relevant
evidence that supports the opinion and the quality
of the explanation provided; the consistency of
the medical opinion with the record as a whole;
the specialty of the physician providing the
opinion; and "[o]ther factors" such as the degree
of understanding a physician has of the
Administration's "disability programs and their
evidentiary requirements" and the degree of his or
her familiarity with other information in the case
record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

The court in Orn also addressed the legal sufficiency of an
ALJ's reasoning:

The opinions of treating doctors should be given more
weight than the opinions of doctors who do not treat
the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th
Cir.1995) (as amended).] Where the treating doctor's
opinion is not contradicted by another doctor, it may
be rejected only for "clear and convincing" reasons
supported by substantial evidence in the record. Id.
(internal quotation marks omitted). Even if the
treating doctor's opinion is contradicted by another
doctor, the ALJ may not reject this opinion without
providing "specific and legitimate reasons" supported
by substantial evidence in the record. Id. at 830,
quoting Murray v. Heckler, 722 F.2d 499, 502 (9th
Cir.1983). This can be done by setting out a detailed

27

> and thorough summary of the facts and conflicting
> clinical evidence, stating his interpretation thereof,
> and making findings. <u>Magallanes</u> [v. Bowen, 881 F.2d
> 747, 751 (9th Cir.1989).] The ALJ must do more than
> offer his conclusions. He must set forth his own
> interpretations and explain why they, rather than the
> doctors', are correct. <u>Embrey v. Bowen</u>, 849 F.2d 418,
> 421-22 (9th Cir.1988).
> <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir.1998);
> accord <u>Thomas</u>, 278 F.3d at 957; <u>Lester</u>, 81 F.3d at
> 830-31.

<u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007).

Here, in the course of finding incredible Plaintiff's subjective complaints of limitations that would preclude even light work, and in evaluating the opinion evidence, the ALJ detailed the multiple opinions in the record from experts who had treated, examined, or evaluated Plaintiff and who had concluded that he could essentially perform light work, such as consulting examiner Dr. Grossman in July 2003, consulting examiner Dr. Tran in 2004, and the state agency physician opining in July 2004. (A.R. 18-19.) The ALJ also noted the multiple opinions of experts who had found that Plaintiff could essentially perform medium work, such as treating physician Dr. Nelson in March 2004, agreed medical examiner Dr. Hutchinson in September 2004, the state agency physician opining in October 2004, and consulting examiner Dr. Tran in June 2006. (<u>Id.</u>) The ALJ appropriately reviewed and assessed the overall medical evidence of record and noted the general consistency of the opinions with respect to Plaintiff's RFC. In so doing, he was articulating a legitimate reason for his weighing of the opinions. The more consistent an opinion is with the record as a whole, the more weight will be given to the opinion. 20 C.F.R. § 404.1527(d)(4).

The ALJ then stated specific reasons for his weighing of Dr.

Wolney's opinion:

> On March 21, 2008, Mr. Gamez's general-medicine treating
> physician, Robert Wolney, M.D., concluded Mr. Gamez was
> incapable even of sedentary work. Dr. Wolney determined
> Mr. Gamez could lift "less than ten pounds" rarely and
> limited him to sitting, standing, or walking less
> than two hours a day. (Even Dr. Wolney observed Mr.
> Gamez had a "significant psychological overlay" to his
> limited physical abilities.) Dr. Wolney also placed a
> question mark in the "yes" block when responding to a
> question about whether Mr. Gamez was a malingerer
> (citation omitted). These responses leave me doubtful
> of Dr. Wolney's opinion.
>
> There is nothing in the record indicating any significant
> change in Mr. Gamez's condition that would support Dr.
> Wolney's opinion. What is more, Dr. Wolney's opinion is
> grossly inconsistent with the other objective medical
> opinions in the record, including opinions from medical
> specialists. Dr. Wolney is Dr. Gamez's general-medicine
> treating physician. For all the reasons above, I find
> the opinion of Dr. Wolney is unreliable and entitled to
> little evidentiary weight.

(A.R. 19.)

The ALJ thus stated multiple, specific reasons, amply

supported by substantial evidence in the record, for putting

little weight on Dr. Wolney's opinion.

The ALJ's reference to Dr. Wolney's acknowledgment of

Plaintiff's "psychological overlay" and the doctor's apparent

questioning of whether or not Plaintiff was a malingerer was

specific and legitimate. It is established that the fact that an

opinion is based primarily on the patient's subjective complaints

may be properly considered. Matney on Behalf of Matney v.

Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where a treating

source's opinion is based largely on the Plaintiff's own

subjective description of his or her symptoms, and the ALJ has

discredited the Plaintiff's claim as to those subjective

symptoms, the ALJ may reject the treating source's opinion. Fair

29

1  v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

2      Here, the objective signs recorded in Dr. Wolney's notes are
3  few; Dr. Wolney necessarily relied to a significant extent on
4  Plaintiff's subjective claims concerning his symptoms and his
5  capacities. The ALJ's credibility findings are unchallenged in
6  this proceeding. Thus, the Court finds legitimate and supported
7  by substantial evidence in the record the ALJ's apparent
8  reasoning that Dr. Wolney's opinion was entitled to less weight
9  because it was dependent in significant part upon Plaintiff's
10  incredible subjective complaints.

11      As previously noted, the consistency or inconsistency of the
12  opinion with the record as a whole is a legitimate basis for
13  assessing the weight to be put on a treating source's opinion.
14  Dr. Wolney's opinion was clearly inconsistent with the overall
15  medical evidence of record, and this substantially supported the
16  ALJ's decision not to give it controlling weight.

17      The Court rejects Plaintiff's contention that the ALJ's
18  reasoning concerning this inconsistency was illegitimate or
19  otherwise legally insufficient because Plaintiff's condition was
20  a degenerative condition that necessarily changed over time. The
21  age of an opinion is one factor to be considered; a more recent
22  opinion may in some circumstances be entitled to greater weight.
23  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993.) Here,
24  however, the ALJ succinctly noted that the record did not reflect
25  any significant change in Plaintiff's condition that would
26  support Dr. Wolney's opinion. (A.R. 19.) As the preceding,
27  detailed recitation of the medical record demonstrates, there
28  were no objective indicia of significant deterioration in

Plaintiff's condition over the time period in issue. Further, as Defendant argues, Dr. Wolney's opinion itself purported to cover the period 2003 through March 2008. (A.R. 423.) Thus, the Court concludes that the rationale concerning consistency was legitimate in force in the circumstances of this case. To the extent that medical evidence is inconsistent or conflicting, it is the responsibility of the ALJ to resolve any conflicts. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Here, the ALJ appropriately resolved the conflicts.

Finally, the ALJ articulated a specific, legitimate reason, supported by substantial evidence, with respect to reliance on the opinions of the specialists in this case, who included orthopedists, neurologists, and practitioners of physical medicine and rehabilitation. More weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. See Holohan v. Massanari, 246 F.3d 1195, 1203 n. 2 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(5). Here, the specialties of those whose opinions were given weight by the ALJ were pertinent to the medical issues presented by Plaintiff's condition.

Plaintiff argues that nothing other than the ALJ's own lay opinion supports the ALJ's conclusions. However, the ALJ's

conclusion that Plaintiff could perform essentially light work[5]
with postural limitations was supported by the opinions of the
doctors other than Dr. Wolney, almost all of whom opined that
Plaintiff could perform exertionally more demanding work than
that the ALJ ultimately found Plaintiff capable of performing.

VII. Disposition

Based on the foregoing, the Court concludes that the ALJ's
decision was supported by substantial evidence in the record as a
whole and was based on the application of correct legal
standards.

Accordingly, the Court AFFIRMS the administrative decision
of the Defendant Commissioner of Social Security and DENIES
Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for
Defendant Michael J. Astrue, Commissioner of Social Security,
and against Plaintiff Hector N. Gamez.

---

[5] Light work is defined by 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds. Even though
the weight lifted may be very little, a job is
in this category when it requires a good deal of
walking or standing, or when it involves sitting
most of the time with some pushing and pulling of
arm or leg controls. To be considered capable of
performing a full or wide range of light work, you
must have the ability to do substantially all of
these activities. If someone can do light work, we
determine that he or she can also do sedentary
work, unless there are additional limiting factors
such as loss of fine dexterity or inability to sit
for long periods of time.

IT IS SO ORDERED.

Dated:   February 25, 2010          /s/ Sandra M. Snyder
                                 UNITED STATES MAGISTRATE JUDGE